1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA

10

11   TIMOTHY R. LOVE,                        No.  2:11-cv-00361-MCE-CKD

12              Plaintiff,

13       v.                                  **MEMORANDUM AND ORDER**

14   SOCORRO SALINAS, et al.,

15              Defendants.

16

17          Through this action, brought pursuant to 42 U.S.C. § 1983, Plaintiff Timothy R.

18   Love ("Plaintiff") seeks redress from Defendants Warden Salinas, Chief Deputy Warden

19   Rackley, Correctional Officers Montgomery and Berghorst, and Nurse Galanis, in their

20   individual capacities,[1] as well as the California Department of Corrections and

21   Rehabilitation ("CDCR") (collectively, "Defendants"), based on alleged violations of

22   Plaintiff's Eighth and Fourteenth Amendment rights.  Plaintiff also seeks redress for

23   claims brought under California state law, including negligence, medical malpractice and

24   a violation of California Civil Code § 52.1.  By its Order, dated June 30, 2011, the Court

25   dismissed Plaintiff's constitutional claim for failure to protect and state law claim for

26   medical malpractice against CDCR.  (ECF No. 31.)

27   _____
          [1] Plaintiff's operative First Amended Complaint, filed on April 27, 2011, also names Dr. Malet,
28   Dr. Zachariah and Dr. Fox as defendants.  (ECF No. 24.)  However, pursuant to the parties' stipulation, the
     Court previously dismissed those defendants from this action with prejudice.  (ECF Nos. 45, 48.)

Presently before the Court is a Motion for Summary Judgment filed by Defendants on March 5, 2013.  (ECF No. 46.)  For the reasons set forth below, Defendants' Motion is granted in part and denied in part.[2]

**BACKGROUND**[3]

At the time of the events alleged in Plaintiff's First Amended Complaint ("FAC"), Plaintiff was incarcerated at Deuel Vocational Institution ("DVI").  Plaintiff was housed in cell 317, which was on the third tier (floor) of the C-wing.  On the night of February 12, 2010, correctional officers Berghorst and Montgomery were distributing toilet paper to the inmates in C-wing.  Toilet paper was distributed by placing the paper outside the door of each cell.  One officer remained on the tier, while another officer opened the doors, in groups of eight, using the automatic control panel.  The control panel used to automatically open the cell doors consisted of several rows of pairs of buttons that corresponded to the cells in the housing unit.  One button opened the door, causing a red light to turn on.  The other button closed the door, and a green light turned on indicating the door was closed.  If a door was unsecured, the red light would flash.  After the inmates retrieved the toilet paper, the officer on the tier gave an "all clear" command, and the officer at the control panel closed each door.

On February 12, 2010, Berghorst was distributing toilet paper on the tiers, and Montgomery was at the control panel on the second tier opening the cell doors.

///

///

---

[2] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefing.  E.D. Cal. R. 230(g).

[3] The following facts are derived, at times verbatim, from the parties' respective statements of undisputed facts.  See Defendants' Statement of Undisputed Facts, ECF No. 46-2; Plaintiff's Response to Defendants' Statement of Alleged Undisputed Material Facts, ECF No. 54; Plaintiff's Statement of Undisputed Facts, ECF No. 54-1; Defendants' Response to Plaintiff's Additional Facts In Support of Opposition to Motion for Summary Judgment, ECF No. 56.

1   Neither Berghorst nor Montgomery received any formal training on the operation of the

2   control panel, and their training in this respect was generally limited to "on the job"

3   instructions from fellow officers.  According to Defendants, "no formal training was

4   necessary because the control panels were self-explanatory and easy to use."  (ECF

5   No. 54 ¶ 48.)

6       When Montgomery opened the door to Plaintiff's cell, Plaintiff remained on his

7   bunk because he did not hear the signal for inmates to retrieve their toilet paper.

8   Accordingly, Plaintiff did not retrieve his toilet paper when the cell door opened.  Officer

9   Berghorst gave Officer Montgomery the "all clear" command to close the doors on the

10  third tier, including the door to cell 317.  Upon receiving the "all clear" from Berghorst,

11  Montgomery pressed the buttons to close the section of doors on the third tier that

12  included cell 317.

13      After noticing that Plaintiff had failed to retrieve his toilet paper, Berghorst

14  instructed Plaintiff to come to the cell door to get the toilet paper.  Then, Berghorst

15  manually opened the door to cell 317.  It is undisputed that Berghorst did not inform

16  Montgomery that he had manually opened the cell door.  Shortly after Berghorst opened

17  the door, Montgomery noticed that the light to cell 317 was red and flashing, indicating

18  that the door was not closed all the way.[4]  Montgomery could not see Plaintiff's cell door

19  from the control panel.  Without confirming whether the cell doorway was clear,

20  Montgomery pressed the "close" button to cell 317 a second time.  According to

21  Montgomery, he closed the door to cell 317 because he was "concerned about the

22  safety of Defendant Berghorst."  (ECF No. 54-1 ¶ 89.)  When Plaintiff bent over to

23  retrieve the roll of toilet paper, as directed by Defendant Berghorst, the door closed on

24  Plaintiff, crushing his head into the doorjamb.  Plaintiff allegedly could not remove his

25  head or body from the door's pathway before the door struck him.

26  _____

27      [4] The parties dispute how much time passed between Montgomery closing the door to cell 317
    and noticing the red flashing light on the control panel.  According to Defendants, no more than thirty to
    forty seconds passed between these two events, while Plaintiff contends that it took more than forty

28  seconds for this series of events to transpire.  (See ECF No. 54 ¶ 15.)

1  As a result of being struck by the closing door, Plaintiff experienced significant pain and

2  was bleeding from his head.

3       According to Plaintiff, Berghorst did not call for medical staff to attend to Plaintiff in

4  his cell but, instead, ordered Plaintiff to walk down from the third tier to the first tier and

5  sent Plaintiff to the infirmary without an escort.  Defendants, however, contend that

6  Plaintiff never asked for help or informed anyone that he needed help going down the

7  stairs.  Plaintiff was later transported to Doctors Hospital of Manteca ("DHM") for

8  treatment and was subsequently diagnosed with whiplash and closed head injury.  He

9  was discharged with a prescription for Motrin and returned to the infirmary at DVI on

10 February 13, 2010.

11      Defendant Galanis treated Plaintiff upon his return from DHM.  Plaintiff continued

12 to feel dizzy and nauseous when he returned to his cell, and he subsequently vomited

13 and started going in and out of consciousness.  After Plaintiff's cellmate called "man

14 down," Defendant Galanis reported to Plaintiff's cell.  When Galanis entered the cell,

15 Plaintiff was lying down on the bottom bunk.  According to Defendants, Galanis

16 immediately attempted to take his vital signs and to get a verbal response from Plaintiff.

17 Plaintiff, however, does not remember Galanis taking his vital signs, but recalls Galanis

18 hitting Plaintiff's chest "very, very hard" with open hands while telling him to get up.  (Id.

19 ¶ 96.)  According to Plaintiff, he was unable to catch his breath because Galanis

20 pounded his chest more than five times.  Plaintiff asked Galanis to stop hitting him, and

21 Galanis stopped.

22      Subsequently, Plaintiff was again transported to DHM where he was treated and

23 diagnosed with a concussion.  As a result of having his head injured in the cell block

24 door, Plaintiff has suffered panic attacks, seizures, partial paralysis, chronic headaches,

25 migraines, severe dizziness, nausea, vomiting and stuttering.

26      At the time of the alleged events, Defendant Salinas and Defendant Rackley

27 were, respectively, the Warden and Chief Deputy Warden at DVI, and were responsible

28 for inmate safety and the proper training and operations of correctional officers.

4

1    Neither Salinas nor Rackley knew Plaintiff, they were not present when he sustained his

2    head injury on February 12, 2010, and they had no knowledge of the medical treatment

3    Plaintiff received and required from DVI and DHM.  According to Defendants, Salinas

4    and Rackley never received a complaint, nor were informed, that the cell doors in C-wing

5    were dangerous, closed rapidly, were improperly maintained or operated, or otherwise

6    posed a threat to the health and safety of the inmates housed in that unit.

7

8                                        **STANDARD**

9

10            Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is

11   appropriate when it is demonstrated that there exists no genuine issue as to any material

12   fact, and that the moving party is entitled to judgment as a matter of law.

13   Fed. R. Civ. P. 56(a); Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1017

14   (9th Cir. 2012).  One of the principal purposes of Rule 56 is to dispose of factually

15   unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

16   Summary judgment should be entered "against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on

18   which that party will bear the burden of proof at trial."  Id. at 322.  "[W]here the

19   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

20   judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

21   answers to interrogatories, and admissions on file.'"  Id. at 324.

22            The Supreme Court explained:

23                    [T]he party seeking summary judgment always bears the
                      initial responsibility of informing the district court of the basis
24                    of its motion, and identifying those portions of "the pleadings,
                      depositions, answers to interrogatories, and admissions on
25                    file together with the affidavits, if any," which it believes
                      demonstrate the absence of a genuine issue of material fact.
26

27   Id. at 323.

28

                                                5

1  In attempting to establish the existence of a factual dispute, the opposing party must

2  tender evidence of specific facts in the form of affidavits, and/or admissible discovery

3  material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The

4  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

5  might affect the outcome of the suit under the governing law, and that the dispute is

6  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

7  nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986);

8  Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355

9  (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is a

10  preliminary question for the judge, not whether there is literally no evidence, but whether

11  there is any upon which a jury could properly proceed to find a verdict for the party

12  producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

13  (quotation omitted).  As the Supreme Court explained,

14
15      [w]hen the moving party has carried its burden under Rule
        56(c), its opponent must do more than simply show that there
        is some metaphysical doubt as to the material facts.   . . .
16      Where the record taken as a whole could not lead a rational
        trier of fact to find for the nonmoving party, there is no
17      "genuine issue for trial."

18  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)

19  (internal citations omitted).

20      In resolving a summary judgment motion, the evidence of the opposing party is to

21  be believed, and all reasonable inferences that may be drawn from the facts placed

22  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

23  255.  However, "inferences are not drawn out of the air, and it is the opposing party's

24  obligation to produce a factual predicate from which the inference may be drawn."

25  County of Inyo v. Dep't of Interior, 873 F. Supp. 2d 1232, 1239 (E.D. Cal. 2012).

26  ///

27  ///

28  ///

1

**ANALYSIS**

2

3        In his opposition to Defendants' motion for summary judgment, Plaintiff has

4    clarified that he will present the following four claims against Defendants at trial: (1) an

5    Eighth Amendment claim against Defendants Salinas, Rackley, Berghorst, and

6    Montgomery for failure to protect from harm under 42 U.S.C. § 1983; (2) an Eighth

7    Amendment claim against Defendant Galanis for excessive force under

8    42 U.S.C. § 1983; (3) a negligence claim against Defendants Salinas, Rackley,

9    Berghorst, Montgomery, and the CDCR under California law; and (4) a claim under

10   California Civil Code § 52 against Defendant Galanis.  (ECF No. 52 at 2.)  Plaintiff does

11   not oppose Defendant's motion with respect to Plaintiff's previously pleaded claims for

12   failure to provide adequate medical care and for alleged medical malpractice.  (Id. at 2

13   n.1.)  Accordingly, the Court will grant summary adjudication for Defendants with respect

14   to Plaintiff's claims for deliberate indifference to Plaintiff's medical needs (second cause

15   of action) and for medical malpractice (fifth cause of action).  The analysis below will

16   focus on Plaintiff's remaining claims.

17

18       **A.      Eighth Amendment Claim for Failure to Protect from Harm under
                 42 U.S.C. § 1983**

19

20       Under 42 U.S.C. § 1983, an individual may sue "[e]very person, who, under color

21   of [law] subjects" him "to the deprivation of any rights, privileges, or immunities secured

22   by the Constitution and laws."  The Eighth Amendment requires that prison officials take

23   reasonable measures to guarantee the safety and wellbeing of prisoners.  Farmer v.

24   Brennan, 511 U.S. 825, 832-33 (1994); Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.

25   2000).  "[W]hile conditions of confinement may be, and often are, restrictive and harsh,

26   they 'must not involve the wanton and unnecessary infliction of pain.'"  Morgan v.

27   Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S.

28   337, 347 (1981)).

1    To defeat a motion for summary judgment on a failure to protect claim, a prisoner must

2    demonstrate that (1) he was incarcerated under conditions posing a "substantial risk of

3    serious harm" to his health or safety, and (2) prison officials were deliberately indifferent

4    to those risks.  Farmer, 511 U.S. at 837; Thomas v. Ponder, 611 F.3d 1144, 1150

5    (9th Cir. 2010).

6        To demonstrate deliberate indifference, a plaintiff must show that the prison

7    official both knew of and disregarded a substantial risk of serious harm to the inmate's

8    health and safety.  Farmer, 511 U.S. at 837.  Thus, "the official must both be aware of

9    facts from which the inference could be drawn that a substantial risk of serious harm

10   exists, and he must also draw that inference."  Id.  "If a person should have been aware

11   of the risk, but was not," then the standard of deliberate indifference is not satisfied "no

12   matter how severe the risk."  Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir.

13   2002).  Plaintiff "need not show that a prison official acted or failed to act believing that

14   harm actually would befall on inmate; it is enough that the official acted or failed to act

15   despite his knowledge of a substantial risk of serious harm."  Farmer, 511 U.S. at 842.

16       Important for purposes of Defendants' instant motion, "[w]hether a prison official

17   had the requisite knowledge of a substantial risk is a question of fact subject to

18   demonstration in the usual ways, including inference from circumstantial evidence, . . .

19   and a fact finder may conclude that a prison official knew of a substantial risk from the

20   very fact that the risk was obvious."  Id.; see also Lolli v. County of Orange, 351 F.3d

21   410, 421 (9th Cir. 2003) ("Much like recklessness in criminal law, deliberate indifference

22   . . . may be shown by circumstantial evidence when the facts are sufficient to

23   demonstrate that a defendant actually knew of a risk of harm.").  Similarly, a defendant

24   would "not escape liability if the evidence showed that he merely refused to verify

25   underlying facts that he strongly suspected to be true, or declined to confirm inferences

26   of risk that he strongly suspected to exist."  Farmer, 511 U.S. at 843 n.8.

27   ///

28   ///

8

1    With these general principles and guidelines in mind, the Court will now proceed

2    to the merits of Plaintiff's "failure to protect" against (1) correctional officers Berghorst

3    and Montgomery, and (2) supervisory officers Salinas and Rackley.

4

5                    **1.    Defendants Berghorst and Montgomery**

6

7    Plaintiff's "failure to protect" claim against Defendants Berghorst and Montgomery

8    arises out of the allegedly improper operation of cell doors by DVI's correctional officers.

9    According to the FAC, Berghorst and Montgomery violated Plaintiff's Eighth Amendment

10   rights by failing to protect Plaintiff from physical injury caused by the closing cell door

11   despite knowing that a substantial risk of serious injury existed.  Defendants now argue

12   that Plaintiff's claim against Berghorst and Montgomery fails because no evidence

13   shows (1) that the doors were "defective, malfunctioning, or otherwise creating a risk of

14   harm," or (2) that Defendants knew of any dangers associated with the operation of cell

15   doors.  (ECF No. 46-1 at 9.)

16   As articulated above, to sustain his failure to protect claim on a motion for

17   summary judgment, Plaintiff must first demonstrate that that the deprivation was

18   sufficiently serious.  See Farmer, 511 U.S. at 834.  Here, Plaintiff has sufficiently

19   demonstrated a significant risk of serious harm from the operation of cell doors by DVI's

20   correctional officers.  The risk of danger from closing cell doors operated by officers with

21   no view of those doors presents an obvious risk to inmates' health and safety.  The very

22   reason for a correctional officer operating the control panel to wait for the "all clear"

23   command from an officer on the tiers is to avoid closing the door on a person who could

24   happen to be in the doorway.  The fact that Plaintiff sustained a brain injury when he was

25   struck by the closing cell door further demonstrates that the "blind" operation of cell

26   doors creates a risk of serious harm to inmates.

27   ///

28   ///

9

1       In arguing that the manner of cell door operations at DVI did not create a

2   significant risk of harm, Defendants rely heavily on the lack of any evidence of prior

3   similar incidents.  However, even in the absence of such prior incidents, the Court may

4   conclude that a condition of confinement presents significant risk to inmate safety if

5   "society considers the risk that the prisoner complains of to be so grave that it violates

6   contemporary standards of decency to expose <u>anyone</u> unwillingly to such a risk."

7   <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993) (emphasis in original).  Taking into

8   consideration that a judicial "remedy for unsafe conditions need not await a tragic event,"

9   <u>see id.</u> at 33, the Court is not willing to condition its finding of a significant risk of harm on

10  existence of prior similar incidents.  Thus, even in the absence of such prior incidents, a

11  prisoner may satisfy the "substantial risk of harm" prong by demonstrating that the risk to

12  which he was exposed "is not one that today's society chooses to tolerate." <u>Id.</u> at 36.

13  The Court is of the opinion that today's society would not tolerate exposing any of its

14  members to the risk of being injured by an automatically closing door operated by a

15  person with no view of the doorway and without verifying whether the doorway was

16  clear.  Accordingly, Plaintiff has met his burden of demonstrating that operation of cell

17  doors by DVI's correctional officers, including Defendants Berghorst and Montgomery,

18  presented an objectively serious risk to inmate safety.

19      The Court now proceeds to assessing whether Plaintiff has presented sufficient

20  evidence to show that Officers Berghorst and Montgomery acted with deliberate

21  indifference to Plaintiff's constitutional rights.  As mentioned above, even though liability

22  for deliberate indifference may not be premised on obviousness or constructive notice,

23  prison officials are not free to ignore obvious dangers to inmates.  <u>Farmer</u>, 511 U.S. at

24  842.  A factfinder may conclude that a defendant knew of the risk from the very fact that

25  the risk was obvious.  <u>Id.</u>  Courts "measure what is 'obvious' in light of reason and the

26  basic general knowledge that a prison official may be presumed to have obtained

27  regarding the type of deprivation involved."  <u>Thomas</u>, 611 F.3d at 1151 (citing <u>Farmer</u>,

28  511 U.S. at 842).

1   As analyzed above, closing a cell door remotely without any view of the door and without

2   confirming that the doorway was clear necessarily puts inmates and officers themselves

3   at risk of getting injured.  In this respect, the risk of "blind" closing of cell doors is quite

4   obvious, which is sufficient to create a genuine factual dispute as to whether Defendants

5   Berghorst and Montgomery knew of the risk.

6          Further, according to Berghorst's deposition testimony, DVI's correctional officers

7   knew that calling out "all clear" informs the control panel operator that there are no

8   individuals in the path of the cell door.  (Berghorst Dep., ECF No. 53-2, 38:10-13.)  In

9   other words, Berghorst and other officers would give the "all clear" signal because they

10  knew that closing the doors without such a warning would expose inmates and the

11  officers themselves to the risk of being struck by a closing door.  Therefore, Plaintiff has

12  put forward sufficient evidence from which a jury could find that, when Berghorst opened

13  the door to cell 317 manually after giving an "all clear signal" to Montgomery, Berghorst

14  knew that Montgomery could close the cell door from the control panel.  On the same

15  note, the jury could reasonably conclude that Montgomery, by pushing the door closing

16  button the second time without first receiving an "all clear" command from Berghorst and

17  without otherwise verifying that the doorway was clear, knew that such "blind" closing of

18  the door could endanger Plaintiff's safety.

19         In sum, the Court finds that Plaintiff has presented sufficient evidence to create a

20  genuine factual dispute as to whether correctional officers Berghorst and Montgomery

21  knew of the substantial risk of serious harm to Plaintiff and disregarded that risk by

22  engaging in improper operations of the cell door.  Accordingly, the Court denies

23  Defendants' motion for summary judgment with respect to Plaintiff's "failure to protect"

24  claim against Defendants Berghorst and Montgomery. [5]

25         [5] Plaintiff also argues that Defendants are liable on the basis of the "state-created danger" doctrine
26  under Section 1983.  (ECF No. 52 at 9.)  The "state-created danger" doctrine is an exception to the
    general rule that a person does not have a substantive due process right under the Fourteenth
    Amendment to be protected from criminal or tortious acts of third parties.  Henry A. v. Willden, 678 F.3d
27  991, 1002 (9th Cir. 2012).  This exception, however, only applies in situations where a state actor, though
    not inflicting an injury himself, created or enhanced the danger to the plaintiff resulting in harm inflicted by
28  a third party or originated from another "private" source.  See id.; Wood v. Ostrander, 879 F.2d 583, 588-

## 2.   Defendants Salinas and Rackley

At the time of the alleged events, Defendant Salinas was the Warden and Defendant Ronald Rackley was the Chief Deputy Warden at DVI, and they both were responsible for inmate safety and the proper training and operations of correctional officers.  The parties agree that neither Salinas nor Rackley knew Plaintiff or were present when Plaintiff sustained his head injury on February 12, 2010.  Plaintiff's "failure to protect" claim against Salinas and Rackley is thus based on those defendants' supervisory responsibilities at DVI and their duty to ensure that the prison correctional officers were properly trained in the operation of the cell doors.

Although supervisory government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior, Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009), they may be individually liable under Section 1983 if there exists "either (1) [the supervisor's] personal involvement in the constitutional deprivation; or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Hansen v. Black, 885 F. 2d 642, 646 (9th Cir. 1989).  The requisite causal connection between a supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be established in a number of ways, including by demonstrating that a supervisor's own culpable action or inaction in the training, supervision, or control of his subordinates was a cause of Plaintiff's injury.  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

90 (9th Cir. 1989); L.W. v. Grubbs, 974 F.2d 119, 121-22 (9th Cir. 1992); Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1087 (9th Cir. 2000); Kennedy v. City of Ridgefield, 439 F.3d 1055 (9th Cir. 2006). The Court, however, is not aware of any Ninth Circuit cases, and Plaintiff has not cited any, applying the "state-created danger" exception in the context of a prisoner's claims for harm caused directly by state actors.  Additionally, as the Supreme Court emphasized, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998); see also Graham v. Connor, 490 U.S. 386, 395 (1989); Albright v. Oliver, 510 U.S. 266, 273 (1994).  Because Plaintiff's "failure to protect" claim is based on the Eighth Amendment, no separate discussion of Plaintiff's substantive due process claim in general, and the "state-created danger" exception in particular, is necessary.

1    "The inquiry into causation must be individualized and focus on the duties and

2    responsibilities of each individual defendant whose acts or omissions are alleged to have

3    caused the constitutional deprivation."  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir.

4    1988).

5         To withstand a motion for summary judgment on the failure to train claim against

6    a supervisory defendant, a plaintiff must present evidence to show that, "in light of the

7    duties assigned to specific officers or employees, the need for more or different training

8    is obvious, and the inadequacy so likely to result in violations of constitutional rights, that

9    the policymakers . . . can reasonably be said to have been deliberately indifferent to the

10   need."  Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (quoting City of Canton v.

11   Harris, 489 U.S. 378, 390 (1989)).  The Supreme Court explained, in the context of

12   municipal liability claims for failure to train under Section 1983, that "[a] pattern of similar

13   constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate

14   deliberate indifference for purposes of failure to train."  Connick v. Thompson, 131 S. Ct.

15   1350, 1360 (2011).  However, evidence of a single violation of an individual's rights can

16   trigger liability if the violation was a "highly predictable consequence" of the failure to

17   train.  Id. at 1361.

18        In support of their motion for summary judgment with respect to Plaintiff's "failure

19   to protect" claim against Rackley and Salinas, Defendants recycle their earlier argument

20   that the cell doors at issue did not present a substantial risk of serious injury to inmates.

21   According to Defendants, Plaintiff has failed to present any evidence demonstrating "that

22   the doors were defective or improperly maintained, repaired, or operated."  (ECF

23   No. 46-1 at 8).  First, as the Court has concluded earlier, Plaintiff sufficiently

24   demonstrated that the "blind" operation of cell doors at DVI presented an obvious danger

25   to safety of the inmates.  Second, Plaintiff's allegations against Salinas and Rackley are

26   not limited to the theory that the cell doors were not maintained or did not function

27   properly from the mechanical standpoint.

28   ///

1   Rather, the crux of Plaintiff's allegations is that the lack of any meaningful training in the

2   door operations created a real possibility of an inmate being seriously injured as a result

3   of correctional officers' lack of coordination in the operation of the cell doors.

4          The record demonstrates that no policy or procedure existed at DVI concerning

5   the operation of the automatic cell doors.  (See Rackley Decl., ECF No. 46-5, ¶ 8,

6   Montgomery Decl., ECF No. 46-4, ¶ 3; Berghorst's Decl., ECF No. 46-3, ¶ 3;

7   Montgomery Dep., ECF No. 53-3, 53:8-11.)  In fact, DVI has provided no formal training

8   in the operation of the cell block doors since 2003.  (Palumbo Dep., ECF No. 46-12,

9   32:12-33:7.)  Both Montgomery and Berghorst stated in their deposition testimonies that

10  they had not undergone any formal training with respect to proper operation of automatic

11  doors, and that the only training they received came in the form of "on-the-job"

12  instructions from their fellow officers.  (Berghorst Dep., ECF No. 46-9, 45:7-17;

13  Montgomery Dep., ECF No. 46-11, 53:8-14.)  There was no protocol as to when the

14  doors were to be opened manually, and when the automatic control panel was to be

15  used.  (Berghorst Dep., ECF No. 46-9, 36:8-14.)  There was no rule as to how long the

16  doors should have remained open for the inmates to retrieve their supplies after the

17  doors were opened automatically.  (Id. 36:24-38:2.)  Moreover, Montgomery testified

18  that, if Officer Berghorst had manually opened a cell door, thus causing the red light on

19  the panel to light up, Montgomery usually would not wait for the "all clear" command from

20  Berghorst before closing the door from the panel.  (Montgomery Dep., ECF No. 46-11,

21  28:8-16.)  Instead, Montgomery would close the door automatically even if he did not

22  know whether the doorway was clear.  (Id. 28:21-29:2.)

23         For their part, Defendants contend that no training was necessary because the

24  control panel that operated the cell doors was self-explanatory and easy to use.  (ECF

25  No. 46-2 ¶ 48; Rackley Decl., ECF No. 46-5, ¶¶ 8, 11.)  However, the Court cannot

26  decide as a matter of law whether some type of formal training was necessary as this

27  determination involves analyzing relevant facts and making credibility assessments that

28  cannot be done at the summary judgment stage.

1       In sum, the Court finds that the evidence presented by Plaintiff with respect to the

2   lack of any meaningful training in cell door operations at DVI is sufficient to create a

3   factual dispute as to whether supervisory Defendants Salinas and Rackley were

4   deliberately indifferent to inmates' safety.  From this evidence, the jury also could

5   reasonably conclude that the lack of training caused Defendants Montgomery and

6   Berghorst to engage in the inherently dangerous practice of "blind" door closing which

7   led to Plaintiff's serious injury on February 12, 2010.  The fact that Plaintiff became the

8   first casualty of the inadequate training does not necessarily absolve Defendants

9   Rackley and Salinas of liability.  Since a jury could reasonably conclude that Plaintiff's

10  injury was a "highly predictable consequence" of supervisory Defendants' failure to

11  implement any meaningful training on cell door operations at DVI, see Connick,

12  131 S. Ct. at 1360, Defendants' motion for summary judgment with respect to Plaintiff's

13  "failure to protect" claim against Rackley and Salinas should be denied.

14

15                    3.       Qualified Immunity

16

17      Defendants also seek summary judgment with respect to Plaintiff's "failure to

18  protect claim" on the basis that they are entitled to qualified immunity.  For the reasons

19  that follow, Defendants instant argument is rejected.

20      "[G]overnment officials performing discretionary functions are shielded from

21  liability for civil damages insofar as their conduct does not violate clearly established

22  statutory or constitutional rights of which a reasonable person would have known."

23  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether qualified

24  immunity applies, the Court should consider: 1) whether the facts, as alleged by Plaintiff,

25  "make out a violation of a constitutional right," and 2) whether Plaintiff's right was "clearly

26  established" at the time of the alleged violation.  Pearson v. Callahan, 555 U.S. 223, 232

27  (2009).  Courts can exercise discretion in deciding which of the two prongs should be

28  addressed first.  Id. at 236.

1    As fully analyzed above, Plaintiff has presented sufficient evidence to

2    demonstrate that Defendants' wrongdoing violated his constitutions right.  Accordingly,

3    the question for the Court is whether Plaintiff's constitutional rights were clearly

4    established, i.e., "whether it would be clear to a reasonable officer that his conduct was

5    unlawful in the situation he confronted."  See Ford v. Ramirez–Palmer, 301 F.3d 1043,

6    1050 (9th Cir.2002).  The Court should undertake this inquiry in light of the specific

7    context of the case, and not as a broad general proposition.  Anderson v. Creighton,

8    483 U.S. 635, 639 (1987); Baker v. Racansky, 887 F.2d 183, 186 (9th Cir.1989).

9    However, "[i]n order to find that the law was clearly established, . . . [the court] need not

10   find a prior case with identical, or even 'materially similar' facts."  Flores v. Morgan Hill

11   Unified School Dist., 324 F.3d 1130, 1136-37 (9th Cir. 2003).  "The salient question . . .

12   is whether the state of the law [at the time of the alleged wrongdoing] gave respondents

13   fair warning that their alleged treatment of [plaintiff] was unconstitutional."  Hope v.

14   Pelzer, 536 U.S. 739, 741 (2002).

15   "[A] district court should decide the issue of qualified immunity as a matter of law

16   when 'the material, historical facts are not in dispute, and the only disputes involve what

17   inferences properly may be drawn from those historical facts.'"  Conner v. Heiman,

18   672 F.3d 1126, 1131 (9th Cir. 2012).  "Only where 'historical facts material to the

19   qualified immunity determination are in dispute' should the district court submit the issue

20   to a jury."  Id.  When analyzing a claim of qualified immunity, the court must view the

21   facts in the light most favorable to the plaintiff.  Friedman v. Boucher, 580 F.3d 847, 852

22   (9th Cir. 2009).

23   According to Defendants, their conduct was reasonable under the circumstances

24   because they had no knowledge of any defect, malfunction, or other problem with the

25   cell doors in C-wing, and the doors were regularly inspected and maintained.  (ECF

26   No. 46-1 at 14.)

27   ///

28   ///

16

1 However, Defendants' instant argument fails to take into account that the main focus of

2 Plaintiff's "failure to protect" claim is not on the defective nature of DVI's cell doors or

3 their improper maintenance, but rather on improper methods of door operations

4 employed by DVI's correctional officers and inadequate training of those officers by

5 DVI's supervisory personnel.  The state of the law in 2010, when the alleged

6 constitutional violation took place, would have given Defendants a fair warning that their

7 failure to protect Plaintiff from a substantial risk of harm from a known dangerous

8 condition was unconstitutional.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976);

9 Farmer, 511 U.S. at 837.  Since Plaintiff has presented sufficient evidence to allow a

10 reasonable jury to conclude that the manner of cell door operations at DVI created

11 significant risk to his safety and that Defendants knew of the risk but chose to disregard

12 it, Defendants are not entitled to qualified immunity with respect to Plaintiff's "failure to

13 protect" claim at this stage in the proceedings.

14

15  **B.    Eighth Amendment Claim Against Defendant Galanis for Excessive
16         Force under 42 U.S.C. § 1983**

17        To prevail on an Eighth Amendment claim for excessive force, a plaintiff must

18 demonstrate that the use of force was the "unnecessary and wanton infliction of pain."

19 Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  Whether force used by prison

20 officials was excessive is determined by inquiring if the "force was applied in a good-faith

21 effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

22 Hudson v. McMillian, 503 U.S. 1, 6–7 (1992).  The relevant factors in determining

23 whether a use of force violated the Eighth Amendment include: (1) the need for

24 application of force; (2) the relationship between the need for force and the amount of

25 force used; (3) the extent of the inflicted injury; (4) the extent of the threat to the safety of

26 staff and inmates as reasonably perceived by prison officials; and (5) any efforts made to

27 temper the severity of the response.  Whitley v. Albers, 475 U .S. 312, 321 (1986).

28 *///*

17

1    The absence of significant injury alone is not dispositive of a claim of excessive

2  force.  Wilkens v. Gaddy, 559 U.S. 34, 37 (2010).  The malicious and sadistic use of

3  force to cause harm always violates contemporary standards of decency and thus

4  constitutes a constitutional deprivation "whether or not significant injury is evident."

5  Hudson, 503 U.S. at 9.  At the same time, not every "push or shove" by a correctional

6  officer is actionable as an Eighth Amendment violation.  Id.  "The Eighth Amendment's

7  prohibition of cruel and unusual punishment necessarily excludes from constitutional

8  recognition de minimis uses of physical force, provided that the use of force is not of a

9  sort repugnant to the conscience of mankind."  Id. at 9–10 (internal quotation marks and

10  citations omitted).  What violates the Eighth Amendment is "the unnecessary and wanton

11  infliction of pain," i.e., infliction of suffering that is "totally without penological justification."

12  Rhodes, 452 U.S. at 346; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir.2002)

13  (Eighth Amendment excessive force standard examines de minimis uses of force, not

14  de minimis injuries).

15    Plaintiff's excessive force claim against Defendant Galanis arises out of the

16  events that occurred when Galanis responded to a "man down" call made by Plaintiff's

17  cellmate.  When Galanis entered the cell, Plaintiff was lying on his bunk going "in and

18  out of consciousness" and "totally dizzy."  (Love Dep., ECF No. 46-8, 105:21-110:20.)

19  Galanis directed Plaintiff to get up, which Plaintiff allegedly could not do.  (Id. 112:1-4,

20  113:21-22.)  When Plaintiff was unable to get up, Galanis allegedly "started hitting

21  [Plaintiff] on the chest with both of her hands" ordering him to get up.  (Id. 113:25-114:2.)

22  Plaintiff remembers Galanis "pounding" him on the chest at least five times so hard that

23  he was unable to catch his breath.  (Id. 114:7-115:5.)

24    In their motion for summary judgment, Defendants argue that, even taking

25  Plaintiff's version of the events as true, no claim for excessive force exists against

26  Galanis because "there is simply no evidence from which to draw an inference that she

27  acted maliciously or sadistically for the purpose of causing Plaintiff harm."  (ECF

28  No. 46-1 at 12.)

1    In particular, Defendants argue that the use of force by Galanis does not rise to the level

2    of a constitutional violation because Plaintiff did not sustain any bruising or other injury

3    as a result of Galanis's actions.  Contrary to Defendants contention, the absence of a

4    significant injury does not absolve Galanis of liability for violating Plaintiff's constitutional

5    rights.  Even a de minimis use of force can violate the Eighth Amendment prohibition on

6    cruel and unusual punishment if the force is used maliciously and sadistically.  See

7    Hudson, 503 U.S. at 9-10.

8           The Ninth Circuit has explained that summary judgment in excessive force cases

9    "should be granted sparingly" because the excessive force inquiry "nearly always

10   requires a jury to sift through disputed factual contentions, and to draw inferences

11   therefrom."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).  Here, the parties

12   present two different versions of Defendant Galanis's motivation to hit Plaintiff which

13   gives rise to material issues of fact as to whether it was reasonable for Galanis to use

14   any force at all, and, if yes, whether the force was applied in good faith to render medical

15   aid to Plaintiff or maliciously and sadistically to hurt Plaintiff.  If the jury believes Plaintiff's

16   version of the events, i.e., that Galanis, without having any penological or medical

17   justification, struck a seriously injured Plaintiff several times in the chest area so hard

18   that Plaintiff could not breathe, the jury could reasonably conclude that Galanis' actions

19   amounted to the unnecessary and wanton infliction of pain.  Since Defendant's

20   contentions articulated in their motion for summary judgment are based on facts which

21   are contradicted by evidence presented by Plaintiff, summary adjudication on Plaintiff's

22   excessive force claim is not appropriate.

23          Defendants also contend that Defendant Galanis is entitled to qualified immunity

24   because "a medical professional in Galanis's position could reasonably believe that the

25   treatment she provided was adequate based on the complaints and symptoms Plaintiff

26   presented with on all those occasions that she saw him."  (ECF No. 46-1 at 14.)

27   ///

28   ///

1   However, the question of whether Defendant Galanis could reasonably believe that she

2   acted properly is closely intertwined with the issue of her intent and motivation for hitting

3   Plaintiff.  The Court may not resolve this factual issue at the summary judgment stage.

4   See Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir.2003) ("If a genuine issue of

5   material fact exists that prevents a determination of qualified immunity at summary

6   judgment, the case must proceed to trial.").  At the time of the alleged wrongdoing, the

7   law was clearly established that the unnecessary and wanton infliction of pain amounts

8   to a constitutional violation.  See Rhodes, 452 U.S. at 346; Hudson, 503 U.S. at 9-10.

9   Accordingly, Defendants are not entitled to summary adjudication on Plaintiff's excessive

10  force claim against Defendant Galanis.

11

12          **C.      Negligence Claim Against Defendants Salinas, Rackley, Berghorst,**
                      **Montgomery and the California Department of Corrections and**
13                    **Rehabilitation**

14

15          Under California law, to establish a prima facie case of negligence, Plaintiff must

16  demonstrate: "(1) defendant's obligation to conform to a certain standard of conduct for

17  the protection of others against unreasonable risks (duty); (2) failure to conform to that

18  standard (breach of duty); (3) a reasonably close connection between the defendant's

19  conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'"

20  Corales v. Bennett, 567 F.3d 554, 572 (9th Cir.2009) (quoting McGarry v. Sax,

21  158 Cal. App. 4th 983, 994 (2008)).

22          According to the FAC, Defendants negligently failed to protect Plaintiff from

23  physical injury even though they knew, or should have known, of facts constituting an

24  impending danger that could compromise Plaintiff's security.  (FAC ¶ 66.)  Additionally,

25  as alleged, Defendants "negligently created, developed, promoted, encouraged and

26  advanced the dangerous conditions . . . and negligently subjected Plaintiff to dangers

27  that Defendants knew or should have known existed resulting in his injuries."  (Id. ¶ 69.)

28  ///

20

1    Finally, as alleged, Defendants "failed to furnish or obtain proper medical care for

2    Plaintiff when he sustained these injuries." (Id. ¶ 67.) In their motion for summary

3    judgment, Defendants argue that they are entitled to summary judgment on this claim

4    because they did not breach their duty of care to Plaintiff. (ECF No. 46-1 at 14.)

5    However, in their reply to Plaintiff's opposition, Defendants have conceded that Plaintiff's

6    negligence claim against Berghorst survives the summary judgment motion because,

7    "based on Berghorst's and Plaintiff's testimony[,] a factual dispute exists concerning

8    Berghorst's failure to advice [sic] Montgomery that he had keyed open the cell door."

9    (ECF No. 55 at 2.) Accordingly, the Court's analysis will focus on Plaintiff's negligence

10   claim against the remaining Defendants.

11

12                     **1.     California Department of Corrections and Rehabilitation**

13        Pursuant to California Government Code § 844.6, a public entity, like CDCR, is

14   not liable for any injury to a prisoner unless a statutory exception applies. One narrow

15   exception to this general rule of governmental immunity covers claims brought under

16   California Government § 845.6, which provides, in relevant part:

17              Neither a public entity nor a public employee is liable for
                injury proximately caused by the failure of the employee to
18              furnish or obtain medical care for a prisoner in his custody;
                but, except as otherwise provided by Sections 855.8 and 856,
19              a public employee, and the public entity where the employee
                is acting within the scope of his employment, is liable if the
20              employee knows or has reason to know that the prisoner is in
                need of immediate medical care and he fails to take
21              reasonable action to summon such medical care.

22   (Emphasis added.) Because governmental immunity presents a jurisdictional issue, the

23   court may properly consider it even if this issue has not been raised by the parties. See

24   Gates v. Superior Court, 32 Cal. App. 4th 481, 509 (1995); Buford v. State of Cal.,

25   104 Cal. App. 3d 811, 826 (1980).

26        In this action, Plaintiff has asserted a negligence claim against CDCR to recover

27   monetary damages for injuries sustained while Plaintiff was incarcerated.

28   ///

1    As alleged, Plaintiff's negligence claim against CDCR arises out of: (1) CDCR's failure to

2    protect Plaintiff from physical injury, (2) CDCR's acts in creating, developing, promoting,

3    encouraging and advancing the dangerous condition at DVI; and (3) CDCR's failure to

4    furnish or obtain immediate medical care for Plaintiff.  (FAC ¶¶ 66-69.)  Since neither

5    party raised the issue of governmental immunity with respect to Plaintiff's negligence

6    claim against CDCR in their moving papers, the Court ordered both parties to file

7    supplemental memoranda addressing whether Plaintiff's negligence claim against CDCR

8    is barred, in its entirety or in part, by the doctrine of governmental immunity under

9    Section 844.6.  (ECF No. 60.)  Both parties filed supplemental memoranda.  (ECF

10    Nos. 61-63.)

11        In his supplemental memorandum, Plaintiff focuses on CDCR's failure to furnish

12    or obtain immediate medical care and contends that his negligence claims is not

13    jurisdictionally barred since CDCR's alleged failure falls within the scope of Section

14    845.6's statutory exception.[6]  (ECF No. 61 at 3.)  Thus, Plaintiff appears to concede that

15    the remainder of his negligence claim against CDCR, including for negligent failure to

16    protect from harm, is barred pursuant to Section 844.6.  The relevant case law also

17    supports such a conclusion.  See Wheat v. County of Alameda, No. C 11–4509 MEJ,

18    2012 WL 966949, at *6 (N.D. Cal. Mar. 21, 2012) (dismissing various state law claims,

19    including negligence, against a county defendant because Section 844.6(a)(2) grants

20    immunity); Wright v. California, 122 Cal. App. 4th 659, 672 (2004) (public entity immune

21    from liability under Section 844.6(a) for intentional infliction of emotional distress and

22    negligence); Savitt v. Jordan, 142 Cal. App. 3d 820, 822 (1983) ("Although we agree that

23    it is regret[t]able to grant immunity to a public entity after it has been proved to be

24    grossly negligent, we must conclude that this is the law.

25    ///

26    ///

27

28        [6] In their supplemental memorandum, Defendants agree that Plaintiff's Section 845.6 claim is not barred under the doctrine of governmental immunity.  (ECF No. 62 at 1-2.)

1   Section 844.6, subdivision (a) explicitly provides that with the exception of certain

2   enumerated sections the immunity granted to public entities is absolute."); Hart v. County

3   of Orange, 254 Cal. App. 2d 302, 306 (1967) ("In sum, [S]ection 844.6 says that a

4   prisoner who experiences an injury which otherwise would be actionable for the reason

5   that he is a prisoner may not recover against the public entity"); see also Cal. Gov. Code

6   § 844.6(c) (precluding recovery for an injury to a prisoner resulting from a dangerous

7   condition on public property).

8        Accordingly, the only part of Plaintiff's negligence claim against CDCR that can

9   potentially proceed concerns CDCR's alleged failure to summon immediate medical care

10   for Plaintiff in violation of Section 845.6.  Section 845.6 "creates a limited public-entity

11   liability when: (1) the public employee 'knows or has reason to know of the need,' (2) of

12   'immediate medical care,' and (3) 'fails to take reasonable action to summon such

13   medical care.'"  Castaneda v. Dep't of Corr. & Rehab., 212 Cal. App. 4th 1051, 1070

14   (2013).  This statute is limited to "cases where there is actual or constructive knowledge

15   that the prisoner is in need of immediate medical care," and "does not create liability of

16   the public entity for malpractice in furnishing or obtaining that medical care."  Id.

17        In their motion, Defendants argue that they are entitled to summary adjudication

18   on Plaintiff's Section 845.6 claim because (1) Defendants Salinas and Rackley did not

19   know of Plaintiff's medical condition or need for medical care, and (2) Defendants

20   Berghorst and Montgomery did not intentionally or unjustifiably fail to furnish Plaintiff with

21   medical care.  (ECF No. 46-1 at 15-16.)  According to Plaintiff's deposition testimony,

22   however, after being struck by the closing cell door, Plaintiff fell to the floor and was

23   bleeding from his head.  (Love Dep., ECF No. 46-8, 63:16-25, 67:16-23.)  Plaintiff also

24   testified that, rather than call for emergency care, Defendant Berghorst waited for

25   incapacitated Plaintiff to get up and directed him to walk to the infirmary.  (Id. 66:16-67:7,

26   69:17-72:4.)  Accordingly, Plaintiff had to walk down from the third tier, where his cell

27   was located, to the first tire, even though he was extremely dizzy and visibly staggering

28   as a result of his head injury.  (Id. 69:17-72:4.)

1  Defendants, of course, dispute Plaintiff's version of the events and argue that Berghorst

2  did not know of Plaintiff's medical condition or need for immediate medical care because

3  Plaintiff neither requested assistance nor told anyone that he needed assistance to get

4  to the infirmary.  (ECF No. 46-1 at 16; ECF No. 55 at 3.)  However, the evidence

5  presented by Plaintiff, when viewed in the light most favorable to Plaintiff, is sufficient for

6  a reasonable jury to conclude that Berghorst knew that Plaintiff was in need of

7  immediate medical care and failed to summon such care when he directed a seriously

8  injured and bleeding Plaintiff to walk down two flights of stairs.

9       Since CDCR is liable for its employee's failure to summon immediate medical

10  care to a prisoner under Section 845.6, the Court denies Defendants' motion for

11  summary judgment with respect to Plaintiff's Section 845.6 claim against CDCR.

12  However, because Plaintiff's remaining negligence claims against CDCR are barred

13  under the doctrine of governmental immunity pursuant to Section 844.6, the Court grants

14  summary adjudication for Defendants with respect to those remaining claims.

15

16            **2.    Individual Defendants**

17

18       Defendants argue that Plaintiff's negligence claim against Salinas and Rackley

19  fails because "no evidence shows that [Berghorst and Montgomery] required training on

20  the operation of the doors or control panel, that they were not properly operating the

21  doors, or that they could not be trusted to act properly without supervision."  (ECF

22  No. 46-1 at 14.)  Defendants further argue that they are entitled to summary judgment

23  with respect to Plaintiff's negligence claim against Defendant Montgomery because,

24  under the circumstances, "[i]t was reasonable for Montgomery to close the door a

25  second time because he could not see the door, had received the all clear from

26  Berghorst, and he was concerned for Berghorst's safety."  (ECF No. 55 at 3.)

27  ///

28  ///

1    Under California law, a jailer has a special relationship with a prisoner that creates

2  a duty of care.  Lawson v. Superior Court, 180 Cal. App. 4th 1372, 1389-90 (2010);

3  Giraldo v. Dep't of Corr. & Rehab., 168 Cal. App. 4th 231, 240 (2008).  A public

4  employee is liable for injury to a prisoner "proximately caused by his negligent or

5  wrongful act or omission."  Cal. Gov't Code § 844.6(d).  As fully analyzed above, given

6  the obvious risks associated with distant operation of cell doors, a jury could reasonably

7  conclude that Defendant Montgomery breached his duty of reasonable care to Plaintiff

8  when he closed the door to cell 317 without verifying whether the doorway was clear.  As

9  to Rackley and Salinas, since both of these Defendants were responsible for ensuring

10 proper functioning of the cell doors and for ensuring proper training of correctional

11 officers, the jury could also reasonably conclude that the supervisory Defendants

12 breached their duty to Plaintiff by failing to provide any formal training on cell door

13 operations to DVI's correctional officers.

14    In light of the disputed issues of material fact, Defendants' motion for summary

15 judgment with respect to Plaintiff's negligence claim against individual Defendants is

16 denied.[7]

18    **D.    Claim under California Civil Code § 52.1 Against Defendant Galanis**

20    Plaintiff's sixth cause of action alleges that Defendant Galanis violated California

21 Civil Code § 52.1 when she repeatedly punched Plaintiff.  (FAC ¶ 88.)  California Civil

22 Code § 52.1 provides a private right of action against anyone who "interferes by threats,

23 intimidation, or coercion . . . with the exercise or enjoyment by any individual or

24 individuals or rights secured by the Constitution or laws of the United States, or rights

25 secured by the Constitution or laws of California."  Cal. Civ. Code § 52.1(a)-(b).

///

26 Section 52.1 requires "an attempted or completed act of interference with a legal right,

[7] Additionally, as analyzed above, genuine issues of material fact remain with respect to Plaintiff's Section 845.6 claim which, as pleaded in the FAC, constitutes a part of Plaintiff's negligence claim.

25

1    accompanied by a form of coercion." Jones v. Kmart Corp., 17 Cal. 4th 329, 334 (1998).

2          Several courts in the Ninth Circuit have held that a Plaintiff may base a Section

3    52.1 claim on the threats, intimidation or coercion "exercised in connection with the

4    alleged use of excessive force" in violation of Section 1983.  Warner v. County of

5    San Diego, No. 10cv1057 BTM(BLM), 2011 WL 662993, at *5 (S.D. Cal. Feb. 14, 2011);

6    Haynes v. City of San Francisco, No. C 09-0174 PJH, 2010 WL 2991732, at *6 (N.D.

7    Cal. July 28, 2010); see also Venegas v. County of Los Angeles, 32 Cal. 4th 820, 841-83

8    (2004) (holding that the use of a threat, intimidation, or coercion need not be separate

9    and apart from the alleged Constitutional violation).

10          Defendants did not address Plaintiff's Section 52.1 claim in the memorandum of

11   points and authorities filed in support of their motion for summary judgment.  However, in

12   their reply, Defendants argue that their failure to address this claim in the moving papers

13   is not determinative because this claim "is predicated on [Plaintiff's] third claim for

14   excessive force." (ECF No. 55 at 2.)  Thus, according to Defendants, "if Plaintiff's

15   excessive force claim fails, so does his § 52.1 claim." (Id.)  As analyzed above,

16   Plaintiff's excessive force claim against Galanis survives Defendants' motion for

17   summary judgment.  As the Court stated in its prior Order, "the survival of Plaintiff's

18   Section 1983 excessive force claim against Defendant Galanis requires survival of

19   Plaintiff's § 52.1 claim against Defendant Galanis." (ECF No. 31 at 16.)  Defendants'

20   motion for summary judgment is therefore denied as to this claim as well.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 46) is GRANTED IN PART and DENIED IN PART as follows:

1.     Defendants' Motion is GRANTED with respect to Plaintiff's Section 1983 claim for deliberate indifference to Plaintiff's serious medical needs (second cause of action) and Plaintiff's medical malpractice claim (fifth cause of action).

2.     Defendants' Motion is GRANTED with respect to Plaintiff's negligence claims against Defendant CDCR except for the claim arising out of the alleged violation of California Government Code § 845.6, and DENIED with respect to Plaintiff's negligence claim against individual Defendants (fourth cause of action).

3.     Defendants' Motion is DENIED with respect to the remaining claims.

IT IS SO ORDERED.

Dated:  August 5, 2013

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT